Good morning, Your Honors. May I please the Court? My name is Scott Goodsell. I represent plaintiff and appellant Raymond Olyaie. Could you clarify, just so I understand what the posture of this case is? The meeting that was supposed to transpire was April 24th, a Tuesday. The assumption of your client was the closing had to be accomplished on April 30, which was the following Monday, I believe. So there were four business days in there. But there is in the record a letter to someone other than your client, obviously, that indicates that as of April 18th, the seller had extended the closing to May 31st. And the name of Carol Sullivan is handwritten on that document, indicating that at some point she received it. And the testimony, I realize there on the other side, I don't know who was asking the questions of her, but that in any event that she learned sometime in April that the closing had been extended. Is the record clear enough to know whether or not the closing date was known by GE before April 24th, that the closing had been extended to May 31st? From my review of the record, it's not. I mean, GE's counsel can inform you. If, in fact, GE understood the closing to be May 31st, not April 30th, would that not be material to its defense and harmful to your case because GE's action taken five weeks before the closing would be entirely different in canceling the April 24th meeting or closing, loan closing, if it didn't think the closing had to be, you know, the ultimate closing had to be four business days later. It was five weeks away. Was the closing extended for all of the purchasers from this company? Does anybody know? Let me, if I may, answer Judge Fletcher's question, and then I will come back. The first issue is that it appears what's this case to a large degree is about a failure of communication. Well, that I understand. That's what I'm trying to understand. Right. I'm not questioning that your client believed April 30th was the closing date. Okay. I understand that from his standpoint. I'm just trying to understand on your view of what the material issues in dispute are, whether you think there's a serious issue that GE on its side had a different idea of what the closing date was. GE communicated to us that, and again, that's the only thing that my client can rely on, that the closing date was scheduled for the 24th, and every indication was that they knew it had to be done by the 30th. Carol Sullivan testified in the record that she believed that all of the insurance issues were going to be resolved during that week, meaning the week before the 30th. If, in fact, she had different information, that's not what she communicated to Mr. Ollier, and the communication issue is the problem because if they had told Mr. Ollier, for example, to use your example, that don't worry about the 30th. It's been extended to May 31st, and we're still working on getting the insurance. He could then, in reliance, have said, well, then why don't I exercise my option to extend the financing agreement? But none of that was forthcoming, and he made efforts to find that out. At the closing, they said, we don't know if it's going to be rescheduled on the 24th. Mr. Rist was spoken to, counsel for GE, on the 25th by Mr. Flagle, and he said, I don't know. There's no new date. And when Mr. Flagle said, well, my client is then going to have to go out and take action to cover, he said, well, do what you've got to do. So that would not be – I mean, obviously, if they knew that, then, yeah, that would be a deception. But we were not being – He had rights under the purchase and sale agreement with Valero to request an extension of closing. Did he, confronted with the GE action, make any effort to try to get an extension before he went out and sought alternate financing? He absolutely did. And it's clear from the record that the people from Valero were there on the 24th to close. And they were as surprised as anybody else that the closing didn't happen. Mr. Ollier spoke with those folks and said, hey, what are you going to do? Can you wait so that – I mean, I don't want to lose this deal. And they actually waited. They were from out of town, but they waited until the 26th when he could close the Pontus hard money loan so that they could sign off on that sale. He asked specifically if he could get an extension from Valero, and they said no. So all of the sources were telling him if he didn't move by – or didn't close by the 30th, that he was just out of luck. Did he ever present GE with a situation where he had met all the conditions and said, okay, now I want my funding? Well, the only condition that – Yes or no? Did he present GE? Did he say, look, I've satisfied all the conditions and now I want my money? I would say that his – You can skip the introduction, I would say. Just tell me yes or no. Yes. Okay. What date was that? That would have been the 24th when he was scheduled. He had insurance? No, but that – Wasn't insurance one of the conditions? Correct, but it was – But you told me that he had all the conditions on the 24th. All the conditions that he was required to satisfy. Well, in the previous case, I don't like lawyers. Well, Your Honor, then I – Not being straight with me. I am being straight with you. So you said he satisfied all the conditions. I then asked you about a specific condition, and you said yes as to all the conditions. I then asked you about one condition. You said no. How can he have satisfied all the conditions and yet have not satisfied the one condition? Judge Kaczynski, there was a condition of insurance, and that was a condition in the original letter. Subsequently, representations were made to Mr. Ollier that GE was going to take care of the insurance. And in fact, ultimately, they went forth and they got insurance through their insurer AIG, and that's why in May and June they were able to close everybody else's transaction. So the fact is there was a condition, but that was either excused – No, no. No. On the 24th – I'm sorry. I am still getting back to you. This was a condition. Insurance was a condition that he was required to present. Either he presents it himself or GE or somebody else provides it for him. He didn't have it on the 24th. How can he tell me that he's satisfied all the conditions? Well, Your Honor, I'm sorry. I'm not trying to be semantic here, but the question is, on the 24th – Well, how about trying to be factual? Okay. On the 24th, he believed that that condition was the responsibility of GE. So he believed that he had done everything he was supposed to do and GE – He also thought it had been met because of his conversations with Sullivan, I guess. Right. And frankly, Sullivan thought that if it wasn't met on the 24th, it was going to be met sometime before the end of that week. In fact – and this is really important because as to GE's intent, they're now arguing, hey, we never had any obligation. We didn't know – you know, that was somebody else's problem. But the fact is, GE went out and negotiated for and obtained that insurance, but they just didn't obtain it by the 30th. And they didn't tell my client that – What effect does their negotiating with insurance? Sure, they could say, fine, we'll try to get it for you, but the obligation was still his under the condition was that he have insurance. Was there a point at which GE said, never mind, you know, in writing as requirements – they said, you know, this can only be ratified in writing, but they notified him in writing saying, you don't have to worry about insurance, we're getting it for you? Was there anything like that? There is a letter. Let me find the reference. Let's look at it. Which says – Where is it? Well, let me do this. I promise to get back to you. I do want to reserve a little bit of time for about – I will find that in the meantime. But – What does the letter say? The letter says that GE is working on getting the insurance for the closing for every – Say you no longer have an obligation to provide insurance? We're modifying the agreement by removing that condition? Does it say that? No, Judge Kaczynski, it does not say those words. So how does that help you? Well, all I can say is I – let me use an example. I mean, I can see where a lender might helpfully try to provide – help a borrower to meet the conditions because they want to make the deal, too. But that's quite different from saying, look, you don't have an obligation anymore. We are taking over the obligation. We are leaving you of the duty to meet the obligation. That's a very different concept. I think it's a scalar concept, and I think that that's where you end up with the trial, is that the evidence comes in. And this was not a trial. This is a summary judgment motion. The evidence comes in, and the court can determine. So you are reading this letter, which you're going to provide me, as being a written removal or a written modification of the agreement by removing the insurance condition. I'm reading it. Do you think that a jury could find that? Yes, I am reading that as being in the context of the other communications that were going on at the time. I'll be interested in seeing that letter. It's an assumption of that particular duty under the contract, and that's the way I would see it. And I think that a trier of fact presented with all the collateral evidence could come to that conclusion. I'll be interested in looking at it. Do you want to save the rest of your time? Yes, I do. Please. Good morning, Your Honors. May it please the Court. Kate Minka on behalf of GE Capital Business Asset Funding Corporation. GE requests that this Court affirm the District Court's order granting summary judgment and entry of judgment in favor of GE Capital. As submitted in our papers and as reflected in the record on appeal, there are no genuine issues of material fact. And, in fact, Mr. Ollier basically adopted our factual statement in response to our summary judgment motion. There are certain core facts here, and I think you were getting at these facts in some of your questions to Mr. Ollier's counsel, that demonstrate that judgment in favor of GE Capital was proper. First of all, twice before Mr. Ollier signed the commitment letter, he was informed that he would need this environmental insurance. This was a letter dated February 14th, and then another letter dated March 5th, both pre-dating the commitment letter, indicating that because his site was contaminated, he would need to fall within GE's environmental insurance policy. And then on March 17th, GE sent its commitment letter to Mr. Ollier, and the commitment letter contained this and other conditions as well. It said that Mr. Ollier's site must be environmentally acceptable to GE and must be included under GE Capital's environmental insurance policy, and that Mr. Ollier must have all insurance that's required by GE in accordance with GE's insurance requirements. And he went over that letter with both his counsel and his broker, C.J. Linden. Now, there was no funding deadline in this letter. The letter only said that the commitment would expire on April 30th and that Mr. Ollier could request a written extension if the terms and conditions hadn't been met by that time. Sometime in early April, he spoke to Ms. Sullivan, and this has become one of the core arguments in his appeal. As we noted in our paper, his breach of the implied covenant claim as alleged in his first submitted complaint was only a wrongful breach of the commitment letter. He never at any point indicated that his theory was now that GE led him to believe, through this conversation with Ms. Sullivan, that the terms and conditions of his loan had been satisfied. That was raised for the very first time in summary judgment. He didn't ask in his opposition papers to amend his complaint to allege this new theory. He didn't ask to amend during the hearing, and as a result that theory was not even properly before the district court. However, even under that theory, the district court ruled that he failed to state a proper claim and that he didn't have any evidence to support his claim. Basically, the only thing that happened in that conversation he says he had with Ms. Sullivan was that he asked her if he could close his loan early, and she said no because Valero wanted to have simultaneous closings with all the dealers at the same time. And that is the substance of the conversation. Well, counsel, if in fact that was properly before the summary judgment court, there certainly is a dispute of fact as to that. Well, I think it's not disputed that the conversation occurred and that Ms. Sullivan said Well, the dispute as to what was said, is that not right? I don't believe there is a dispute as to what was said. Even if one accepted Ollier's former counsel's question as evidence, because what happened was he didn't actually submit Ms. Sullivan's actual testimony in the record. He asked a question, a two-part question. She answered yes to one of those parts, and he submitted that question and her answer as evidence. And the fact that he didn't submit her actual testimony is very telling because her actual testimony does not say what he says it says. But even under counsel's question, all she would have said is you were qualified for the loan. What is qualified for the loan? He qualified when he got the commitment letter, but that does not mean that he satisfied all the specific terms and conditions of the commitment letter. Let's turn to what happened on the date that they canceled the closing. They canceled it without saying anything to anybody as to the reasons. They canceled. And the lawyer didn't know why it was canceled? They canceled on the 24th, and all Mr. Ollier was told, as far as his testimony, was that the title company called him and said it's canceled, but it will be rescheduled. And it's undisputed. He said that that's what he was told, that it would be rescheduled. And the title company representative said that that's what she told him. He testified, and this is very clear in his deposition testimony, that as soon as that was canceled, he, quote, unquote, quote, gave up on GE and didn't want a loan from GE at that point. Well, there were phone calls to GE. Is that not correct, that went unanswered? He said that he tried to call Ms. Sullivan and that he tried to call Mr. Tubb, who was another GE person working on this pool of loans. He conceded in his deposition that he probably didn't leave any messages for Ms. Sullivan. So when he states in his declaration, very vaguely, that I left messages and that's all he said, assuming that those were for Mr. Tubb, he didn't say what he said in those messages, he didn't say that he asked Mr. Tubb to return his calls, and he didn't say that he asked Mr. Tubb to give him any assurances that the loan would close at any particular time. Now, his counsel got a hold of GE's counsel. Is that correct? That is correct, honey. He did talk. On April 25th. And what did that counsel tell his counsel? He told him that he would need to speak to GE with respect to when the loan would close, that he didn't have any information and the person he would need or the people he would need to speak to were at GE Capital. And there's no evidence that Mr. Flagel ever called anybody at GE Capital at that point. As I said, as soon as he found out that the 24th had been canceled, but that it would be rescheduled, he gave up on GE at that point. That very same day, he met with a new lender, he filled out a loan application, they drove around and looked at the property that was going to have a deed of trust on that property. The lender received appraisals and title reports this very same day. And during this time, GE – The lender did not require insurance or had insurance? The new lender? Or was there, in fact, insurance? I am not sure what the new lender required. I'm only asking what the record reflects. You don't know what – I don't know. Will you at some point address this? Do you know the letter that Council is referring to and what it says? Well, there's three key letters. The first was Andy Tubbs' February 14th letter, and that is at RES 309 to 310. And that's where Mr. Tubbs says that Mr. Ollier and anyone else with a contaminated site was going to need this insurance. And that there were three requirements to get this insurance. One of them was that he was going to need an acceptable indemnity from Valero, but that the indemnity proposed by Valero was insufficient. And so what Mr. Tubbs had proposed, and he made it very clear that this was a proposal and that – It was in the letter. Can you read from the letter? Yes. Okay. Just to be clear, you're looking at the February 14th letter? Right. There were three letters. There's February 14th, then there's March 5th. So tell me what you're doing. I just wanted to make sure we're all on the same page. Yes. This is the February 14th letter. Correct. Go ahead. In this letter, which is to Mr. Ollier's broker, Mr. Tubbs says that GE Capital has a secure lender policy from AIG Insurance that allows GE Capital an exit strategy from a loan that is defaulted and also has environmental conditions. This is where they said the indemnity from Valero's insurer. Right. And that there's three conditions for a site, a contaminated site, and Mr. Ollier's site was contaminated, to qualify for this insurance. And one of them was an acceptable indemnity from Valero, who was the seller. So they undertake to find a gap coverage, in effect, from AIG. I'm sorry? And GE offers a gap coverage. It offers to try and get gap coverage, if we want to call it that, from AIG. Correct. It's a fourth alternative to try to get it to fall within the GE policy. So at this point, he tells them that this is an open question. But it also says GE is making steps to try and help this loan close. Correct. So what then happens next? So then after that, Mr. Fryermuth, who is also a GE, sends Mr. Ollier a letter, and that is an RES 313. Give me a date. March 5th. Okay. Both of these are before the March 19th agreement. Correct. So he's being informed even before the fact that this is an issue. And in this letter, he says, second paragraph to the bottom, borrower will need the environmental insurance that Andy Tubb has been speaking with you about, as well as inclusion in our environmental insurance pool. So, again, he's informed of this condition. And then the commitment letter is at RES 316 and 322. This is March 19th? Yes. Which merges everything else into it, right? Correct. It lists the indemnity as a condition. It also lists that Mr. Ollier will need to get all insurance in such amounts as GE Capital may require and in accordance with GE Capital's insurance requirements. And then on page 322, on the top of the page, it says the site must be environmentally acceptable to GE Capital. I'm sorry, 322? Yes. Page 6 of the. Page 6 of the letter. Yeah. These things have numbers all over them. Yeah. Yeah, I have it. That's what it means, APP0016. So do I. But, anyway, we're on the same page. Okay. On the top of that page. This is the top of the page where it says for parenthesis. Correct. Go ahead. That the site must be environmentally acceptable to GE. And then towards the bottom of that paragraph, the results must be acceptable for the site to be included under GE Capital's environmental insurance policy. So, again, this is the third time that he's told that this is an issue and this is a condition that's going to have to be satisfied before he gets any money from GE. And on April 10th, Mr. Olia sends in an application to AIG, which he testified he understood, was for the purposes of applying for this insurance. So he knew at that point that this insurance issue had still not been satisfied. Andy Tubb also testified that he spoke to Ms. Linden. What happened to the AIG effort? We adverted to that earlier on the first letter that GE was undertaking to find the insurance through AIG. What happened with that? It was eventually they did receive an AIG policy. Is there anything in the record to indicate that you don't dispute as to what Mr. Olia was being told about GE's efforts and successes or near successes or no success about getting that insurance? What I was just about to say was that Mr. Tubb testified that throughout the month of April, he kept Ms. Linden informed, who undisputably was Mr. Olia's broker, throughout the course of April that this was still an open issue and that it hadn't been resolved. Right. But at that point, Olia was looking to GE to close the AIG coverage? He understood that this was an issue. That's not my question. As Judge Kaczynski, you know, said, could you give an answer, yes or no, and then explain. Did they tell Mr. Olia, understand, was he told by Mr. Tubb, that GE was working to procure this insurance so that the loan could close? Yes, he was told that in the three letters. Okay. So as far as Mr. Olia was concerned, GE was working with him to get that insurance to meet the condition that he had to make. They weren't sitting back passively, GE wasn't sitting back passively waiting for Mr. Olia to come up with a solution. Right. Did Mr. Olia, excuse me, Mr. Tubb or people from GE, understand that Mr. Olia was essentially relying on GE to succeed in that effort or did they expect him to be making parallel or independent efforts on his own? GE undertook this to assist its borrowers. Sure. However, it was made clear that this was still a condition of the loan. I understand, but the question is, my question again is, was GE's people understanding, per the evidence, that Mr. Olia was looking to GE to do it? He wasn't doing anything on his own because he thought GE was going to take care of it. Sure, if GE failed, there would still be the issue that the condition hadn't been completed. There is no evidence that GE knew that Mr. Olia was relying on them, if that's your specific question. That was my specific question. Mr. Olia was taking certain actions, though, to assist with this, such as filling out the question. Were they asking him whether he was making any efforts to get insurance to moot GE's efforts to get a 3A AIG? There's no evidence of that. No. Now, what did Mr. Olia understand when they set the closing for April 24 and said, everybody be here, would he not assume that the condition had been met? I don't know what Mr. Olia assumed. I didn't see anything in the record. I'm not asking, wouldn't it be natural for him to assume that? It would be natural for him to assume that it was closing on the 24th just by the reason that the parties had scheduled it for the 24th. But it's not natural for him to assume that April 30th was a funding cutoff. GE scheduled it for then. Well, Mr. Olia, there's testimony in the record that Mr. Olia wanted to close early because he had plans to go out of the country. Well, so what? I mean, the point is GE scheduled the closing. Would they schedule closing and invite him to it if they thought he hadn't met a condition? They were working to – they were still trying to get that condition satisfied. The answer is yes, they would have, even though the condition hadn't been met? No, they were not going to close if the condition was not met. So was anybody advised in advance of that meeting, before they all showed up at the meeting, that Mr. Olia was in default under his obligations under conditions? Well, Ms. Linden was advised throughout the course of the month that this was still an open issue. That is not my question, counsel. The question is you set an April 24 closing. Okay, so everybody flies. I mean, there are people coming into Los Angeles, I guess, for this. Walnut Creek. Hmm? Walnut Creek. Walnut Creek. Well, you know, they're all the same in the same state. Okay. So everybody shows up, and boom, GE has canceled the closing. Was there any statement in advance of that to put Olia or anybody on notice that this thing was a conditional appointment on the 24th because Mr. Olia hadn't yet complied with the insurance condition? There were no statements that it was a conditional closing. They were trying to work – they were still working on the insurance. Right. So as far as everything was structured, it looked as if it was all set to go, and then GE pulls the plug on the meeting and doesn't tell Mr. Olia why. Does not tell Mr. Olia why. Why. Correct. So it doesn't say we're canceling this meeting because you haven't complied with the condition. You haven't got that insurance. Okay, and then he tries to find out, well, what's going on? As far as he knew, it had to be closed. Whether he wanted it closed early or not, he knew he had, as far as he was concerned, to close by April 30th, didn't he, with the seller? Well, there's testimony in the record that the seller said that he could not have an extension. However, Mr. Olia testified that he was under the impression that he did have an extension. Okay, so there's a disputed issue of fact. This is on summary judgment. Those aren't disputed. I think that's not inconsistent. The fact that Mr. Olia understood that he had an extension. That he knew of the May 31st extension, is that what you're saying? No, he testified that he understood that it was his belief that he had a few days past April 30th from Valero. A few days. A few days, which is significant given the fact that he got a loan immediately after learning that the 24th was. . . That he wouldn't close the loan transaction early, and he knew that GE had canceled the April 24th meeting. And he knew that he couldn't get information from GE why or when it was going to be rescheduled. He didn't know when it was going to be scheduled. He was told that it would be rescheduled. But if it was being rescheduled outside the few extra days he had, it wouldn't do him any good, would it? Well, under his understanding. . . If it was conditional for that closing, which was financing from GE, then whenever GE rescheduled the closing meeting, if it was not timely enough for Valero, then it didn't make any difference when GE came forward. Well, you know, one of the questions you had asked counsel for Olia was whether or not GE was under the impression that Valero had continued a deadline for everybody. And the answer to that is yes. There's no evidence that Mr. Olia ever said, I can't get an extension from Valero. He never notified Olia or GE Capital of that at all. GE Capital was working under the assumption that everybody. . . It doesn't sound like as of the 24th he needed an extension because he thought it was going to happen. So what evidence are you looking for other than you're saying that they should have been told post-April 24th that April. . . As of the 25th, he knew he needed an extension. I'm sorry? As of the 25th, he knew he needed an extension. He never asked GE for an extension. He didn't need an extension from GE. What he needed was a loan financed by, funded by the time he had to close with Valero, right? That's what he needed. Well, that was his thinking. There was no April 30th funding deadline, though. You know, Counsel, it's quite, from the questions we're asking, it doubts that summary judgment can stand. If that's the case, would you people not want to go to mediation and settlement? I don't think that there are any disputed facts at all in summary judgment. I mean, I think the facts that they're throwing out. . . or their response to summary judgment were facts that were based on two declarations that were drafted by Mr. Ollier's counsel for the purpose of imposing summary judgment. And what's important in those two declarations is what they don't say. Both Mr. Ollier and Ms. Linden say, I was never told that the specific terms and conditions of the loan hadn't been satisfied. Well, that's a very, very technical, carefully drafted statement. They never say, I did not know that the terms and conditions had not been satisfied. And that is because at least Ms. Linden, and I believe Mr. Ollier as well, knew that they hadn't been satisfied because she was in constant communication with GE Capital throughout the course of April. So there are only, quote, unquote, disputed facts. My question to you, I didn't want to re-argue all this. Your time is way over. If we were to find that this wasn't appropriate for summary judgment, would you like to go to mediation? I suppose it's possible, but I think that we're going to be in the same boat in terms of everybody knows what the facts are. They're not disputed. So, you know, it's certainly a possibility, but. . . Thank you. Okay. Thank you. We have some time for a bottle. I forget what it was. Yes, close to two minutes. Well, we gave the other side seven additional minutes. I may be able to keep myself to two minutes. I'll give you a full two minutes then. Thank you. The pages that you were looking at you've just been discussing with opposing counsel. That's in the appellant's excerpts of record for the letter I was referring to. It's pages 112 and 113. It's APP 0112 and 0113. Which letter is that? This is the February 14th letter to Ms. Linden. Yeah. Is that the letter you were referring to earlier? Yes. And that's the one where on the second page it refers to GE has proposed to AIG Insurance that they will add it to their secured lender's insurance. You forgot the first phrase. You made the same mistake as counsel in the earlier page, in the earlier case. It says to attempt to overcome the insufficient identity, GE has proposed AIG. It doesn't say we're relieving you of anything. It says, you know, to try to figure this out, we propose this. Your Honor, respectfully, when you ask me specifically if there was a specific statement saying we are releasing you, we are excusing you, or we are waiving. I don't think I said specific. Even a general statement would be too harsh. In any event. Is there any kind of statement saying we're relieving you of your obligation? No. And my point, Your Honor, was not that there was such a specific statement relieving that. Is there a general statement? Is there such a statement? That this statement indicates that that duty was also being undertaken to obtain insurance was also being undertaken by GE. What does it say there? Well, I think that's what the paragraph says. We've asked AIG to provide GE capital with a quote on a premium. Let's say we have undertaken the duty. What? What about this? I mean, it's sure. I mean, they say, you know, we're going to help you out to attempt to overcome the insufficient indemnity. We're doing this for you. It doesn't say we're in any way taking over your burden or we're relieving you of the burden or anything of that sort. Where is it? Your Honor, I can read an inference into this that GE was going to look for insurance to cover everyone. Assuming you could. Your Honor, February 14th, 2001 comes in my calendar before March 19th, 2001. Correct. And the March 19th, 2001 financing agreement has a merger clause. It says everything else that comes before is superseded, and this is the deal. So I don't understand what your alliance on the February 14th letter does to help you. Since everything gets wiped out, as I understand the merger clause, all inconsistent prior representations or agreements get wiped out in the March 19th letter, which is a month and five days later. So whatever they may have said on February 14th, how does it survive March 19th? Because on March 19th and on March 20th and every day thereafter, GE was continuing you just heard representation from their counsel. I understand they were continuing, but you are relying on something in the February 14th letter which you say you can read an inference that they assumed a certain obligation. It doesn't say that. It doesn't say it, but you say you can argue this to a jury. But the February 14th letter is wiped out by the March 19th agreement. Do you disagree with that? I mean, it has a merger clause. It has – it says quite specifically that prior – prior – it specifically has an insurance obligation in it. Your Honor, respectfully, conduct after the contract is signed can be indicative of the interpretation of that contract. It says this commitment constitutes an entire agreement between – it says prior negotiations. This commitment constitutes an entire agreement between GE Capital and Bauer related alone. Any and all prior proposals, commitments, agreements, representations, and warranties made by GE Capital, whether oral or written, are deemed superseded hereby. No extension amendment or waiver of this commitment shall be valid or enforceable unless it made in writing and signed by GE Capital and Bauer. I can't imagine how the English language would come up with something more explicit saying whatever we said beforehand is gone. This is now the deal, and anything we might have said or written or told you or represented or implied before that is wiped out. I can't imagine if this does not do it, then the human – then the English language is incapable of achieving that result. And I – so I don't know what your reliance on the 14th, the February 14th letter, how that is plausible under the circumstances. Your Honor, I believe the question that initiated this was when you asked me if there was anything in writing which indicated that GE Capital was willing or intending to take on this obligation. I think what I said was, is there anything in writing that relieves your client of the obligation under the agreement? Okay. You have to point to – you have to point to something that is post the March 19th agreement, because everything prior thereto is like a – has been wiped out. Anything – so let me make my question clear. Anything post the March 19th agreement that reaches that result? I'm aware of it. That – that by implication or directly or expressly or generally or any way you want to, anything in writing that relieves your client of this obligation? Qualified by – In the record. Qualified by in writing? No, I don't believe so. Okay. Now, this does say, no extension, amendment or waiver of this commitment shall be valid or enforceable unless it's made in writing and signed by both GE Capital and borrower. Is there anything that meets the conditions of this last sentence that purports to relieve your client of the obligation? No. There would have been nothing in writing. However, Your Honor, if you will bear with me, let's assume that the closing had occurred on the 24th as it did of April, as it did with everybody else in May and June. And in that closing, one of the elements was that there was an insurance policy, an insurance premium for my client to sign off on in favor of AIG Insurance. That would have been the writing that satisfied that condition. My client went to the closing or was prepared to go to the closing on the 24th to sign just such an agreement. I'm sorry. Is this a hypothetical piece? Yes, I said. Is it in the record? No. You – I've tried to answer your question. I've asked you what's in the record. Yes. You're saying if you had something else in the record, it might help you. The other – But it's not in the record. Well, the other elements in the record are, as attested to by opposing counsel, that there were ongoing conversations during the framework. Was it a written conversation signed by your client and GE? No. Okay. So there were not things that met the last sentence of the March 19th agreement. There was no writing that excused that condition. You've answered my question. I think your time is up. Very well. We'll take a five-minute recess before the next case.
judges: B. Fletcher, Kozinski, Fisher